KING, C.J.,
Dissenting.
¶ 25. The majority finds that the trial court committed error in allowing into evidence that portion of Floyd Robinson’s recorded interrogation which discussed his involvement in another crime substantially similar to that for which he was being tried. Having found this to be error, the majority proceeds to minimize it by saying Robinson’s later mention of the same matter transformed it into harmless error. Believing the majority to be in error, I dissent.
¶ 26. In order to understand why I believe the majority is wrong, it is necessary to first know precisely what was said in the interrogation and second to place Robinson’s trial testimony into the proper prospective.
¶27. During Robinson’s interrogation, the detective asked him about two prior allegations of violence against girlfriends, one of whom was the murder victim in this case. The relevant portion of that interrogation is transcribed as follows:
Detective 1: I want to read something, okay. This is the West Point Police Department report that Bridgette Moore filed on April-on the 16th of April, 2004 at 00:11.
I, PFC Everette Cook, was dispatched to 1615 Mayhew Street in reference to a fight. Upon arrival I spoke with a Ms. Bridgette Moore. She advised that her boyfriend, Floyd Robinson, had beat her with his fist in her face and upper body. She also advised that he choked her and she thought he was trying to kill her. She advised that she got away by opening her truck door and running to his mother’s house. She then called police.
Floyd was gone on my arrival. Bridgette came to the police department and signed an affidavit on Floyd for simple domestic violence.
Detective 1: Now, I want you to let me read this other one to you, too. Let me read this one to you, this is from of all people the other woman you have been talking about.
On the above date at approximately 20:52 hours I, Officer Williams, took a report from Mrs. McKinney concerning her boyfriend. It said Mrs. m-r-s McKinney concerning her boyfriend, Floyd Robinson, who constantly keeps threatening her about killing her. He’s always talking to her in the middle of nowhere-taking her to the middle of, no I’m sorry he is always taking her in the middle of nowhere putting a gun to her head and throat and telling her what he would do to her. On the last evening 5-24-03 at approximately 16:30 to 17:00 hours, he took her to his house and started washing dishes. And when she told him that she was going home, he went ballistic, and started to push, kick and pull out her hair. He pulled a gun on her then, and once he settled down he just told her to leave. She left and went home and then called the police.
Detective 1: My goodness.
Floyd: That’s a lie, and I know that’s a lie.
Detective 1: Okay, you’ve got two women saying they felt like you were going to kill them at one point or time. Two separate women.
Floyd: What would I want to do that—
*532 Detective 1: Do you not do a good job of managing them? Or what, you don’t know how to talk to them? What happens?
Floyd: I don’t have no problem with no women.
Detective 1: Excuse me—
Floyd: A woman.
Detective 1: They have a problems with you, then right? You may not have a problem with them.
Floyd: I talk to a lot of ladies.
Detective 1: Well, we are talking about the two, that you
Floyd: It don’t get that serious with me.
Detective 1: I’m sorry, cause, we are talking about the two that you have been dealing with.
Floyd: Okay.
Detective 1: You been dealing with Mrs. Moore.
Floyd: Um-hum.
Detective 1: And she, you know you said that you didn’t have these incidents in West Point. I got two different women saying you know, saying you are doing these things to them. What do you say to them? What happened in that in — explain to me — explain what happened. First — tell us what happened with Mrs. McKinney? She said you were washing dishes. She said she was going home and you go ballistic. You take her to the middle of nowhere, you pull a gun on her, threaten her.
Detective 1: Now, here’s what I think, here’s what I think happened.
Detective 2: This sounds crazy, man.
Floyd: I’m like — a woman gonna tell you anything — they go over there and tell you anything, they are going to say anything.
Detective 2: This is true, this is true. Someone made mention of a gun.
Floyd: Huh?
Detective 2: Somebody made mention of a gun that they got from you last year. Did you have a gun?
Floyd: Last year?
Detective 1: 2003.
Floyd: That was 2003.
Detective 1: Mrs. McKinney.
Detective 2: Where did you get a gun? Floyd: I didn’t have no gun.
Detective 1: Who was she married to? Floyd: Uh-huh, some fellow.
Detective 1: So you were seeing her when she was married ?
Floyd: Uh-huh.
Detective 1: So you weren’t truthful when I asked you?
Floyd: She was going through her divorce.
Detective 1: Okay, but she was married?
Floyd: Her and her husband had broken up about a year or so.
Detective 1: Mrs — they were going through a divorce, they weren’t divorced.
¶ 28. The foregoing information was placed before the jury as a part of the prosecution’s case-in-chief, well prior to any testimony from Robinson. Once the prosecution introduced this admittedly prejudicial material as part of its case-in-chief, Robinson sought to minimize the prejudicial effect of this improper testimony by offering an explanation. That explanation is found in the testimony of Robinson which follows:
Q. What do you mean by you “B”?
A. My bitch. And I said, oh, Lord, here we go. I said, well, we ain’t fixing to start all this. She said no, that’s where you were. That’s why you really didn’t want to come over here because you just want to be with her. In my *533 mind I said, yeah, I did, but I said, well — we just kept on talking. I said, well, I don’t know. You don’t hear me complaining about you with a man or nothing. Why you keep hounding me down. I said I’m not bothering you. I said why.
When I got up — I said, I’m fixing to get ready to out. I didn’t come over for this here. I said I’m going to get ready to go. When I got up, she hit me in my back. And she went and grabbed the phone. I said, oh, Lord, here we go with the poli — with the phone again. I said go on and call the police. I said, well, I’m gone.
I was leaving the house — I went and put my clothes on and leaving the house. When I opened the door to leave and I said so I left my keys. Let me go back and get my keys. I turned around to get my keys and I was getting my keys and I looked up and she had the gun. I said what you doing? And she, well, you going over to be with that bitch, ain’t you? I said this don’t make no sense.
I said — and she got up close to me. That’s when I grabbed her hand, and we started wrestling with the gun. And we fell outside the house. And we fell outside, and that’s when the gun went off. And I said see there, this don’t make no sense. I said — and really I thought I was shot, and she said she thought she was shot. And I said, Bridgette, this don’t make no sense, and I walked her back up to the steps. And she told me, said, she was kind of tired. I said, Bridge, this don’t make no sense. I said, I’m fixing to go. I seen the gun. I grabbed the gun. Said I’m fixing to go. I You know, the police come around here. I’m already on probation. I said I’m fixing to go and I left. And I said I’ll call you back.
When I got home, I tried to call her back. I called, and I didn’t get her answer. It was busy. And after that, I said, well, I’m going to bed. She probably got the police over there. And she mad and ain’t going to answer the phone. I said, well, I’m going to bed and get me some sleep so I can go to work. I got up that morning and went called again. I said the phone still busy. I said, well, she still mad with me.
I said, well, and I got in my car. It was about ten minutes after six that morning. And I said, let me warm this car up ’cause it’d been cutting off on me. I said, well, let me call again. I said no. We ain’t going to worry about it. I’m going to go on and go to work.
I started driving to work, and my car was cutting off on me. And I called my boss and told him, I said, I’m probably going to be little late. I’m trying to get my car fixed. My car keep cutting off on me. I’m out here on the bypass and it’s cutting up. I have to sit — let it sit for awhile and then it will start back up. And he said okay. He said, just come on in when you get a chance, and I said all right.
I got the car — went it finally — I said, well, I’m going to try to take it over to Mr. Logan. I’m getting a little late now. I said, I’ll get it over here. I went over there, and he wasn’t there. And I said, well, I said, okay, I’ll just check another time. I’ll try to do it again. I said let me try to go over to Bridgette’s and see how she doing, see if she’s still mad at me.
I went over to her house, and I went up there and drove up to the house and come out and walked out to the house. And the dog started to run (inaudible) like that. I said, you know who this is. And I said, well, let me knock on the door. I said she might not even open it. I knocked on the door and I didn’t get no answer. I said let me see is it *534 locked, and I twisted the knob. It was open and then that’s when I saw her. And I said, uh-oh. I thought, man. And just like that and I said, well, I closed the door back. And I said, oh, Lord. And just like that. And I left. I said oh, man, I got to go tell my father. Let him know. This ain’t — huh-uh.
And I got up to my — I sat at — I said I’m going to take my life this here. Them folks going to think I did this here to her. I said, Lord, I feel like she dead. Folks going to think I did it to her. And I said I’m already only probation; ain’t got no business over there.
And I went out in the county. I was going to drink some beers and stuff to get my nerve up, and I put the gun to my head and pulled the trigger, and it did not shoot. And I said, well. I throwed the gun down in the water. I said, well, I’ll go and get a gun. That’s when I went to my father’s house and got his and tried to do the — I was going to do the same thing.
When I left my father’s house and I got ran off in the ditch, I pulled the trigger on it, and it didn’t shoot still. And I said what’s wrong? And I point the gun down in the floorboard and it shot. And my father told me, son, it’s not worth it. Ain’t no sense in you taking your life. And I thought about it and I said, well, yeah. And I said, Lord, I don’t know. These folks going to think I done did something. And I said, well.
I went on home. And I don’t know how I got home at that point, I really don’t, because I had been drinking. And when I did make it home, the only thing — it might have been about 1:30 or — about 1:30 or something, two I think. And I went in the house and I sat there and I-next thing I know I was — it was night, and I said, well, let me lay down and get me a little sleep. And I laid down. I said, well, I said, I’m tired. And I laid down and got me some sleep.
And the next thing I know, I said, I heard a shot. I said, what the world is this going on. I thought somebody shooting. And I said, I smell some gas or something. And I said, this is down here. So I go up here and I — I was upstairs, and I opened my window and went outside. And they said it’s the police. And I said, the police? I said, oh, man.
And then they ran on the opposite side of the house. I said, no, I’m on this side over here. And they came back over there and said come down. I got halfway down out of the — in the tree, and they dragged me down to the ground. And they said we’re arresting you for the murder of Bridgette Moore. And I said what? And then I got in the car and I asked the officer, I said, sir, how long y’all been out there? He said, man we been out there ever since — he said, it’s been about five hours. I said—
Q. Let me stop you right there. I want to go back because you’ve been going on for quite a while and I want to—
A. Sorry.
Q. No. No. No. I want to clarify some things that you mentioned in your statement. You said that you were already on probation. Why were you on probation?
A. It was because Bridgette and — it was for Bridgette Marilyn McKinney.
Q. When you say for Bridgette and for Marilyn, what do you mean?
A. It was like for the domestic violence situation.
Q. Had you been found guilty of domestic violence?
A. Well, I pled guilty to it. And only reason I pled guilty it because I had just started working at Weyerhaeuser. And I said, well, I said, since I can’t take off work to be coming back to court, I said, *535 I’ll go ahead and plead guilty and pay the fíne and be through with it. That’s what I thought because I asked the lady working at the desk at the police department in West Point. She told me, said, that’s the best thing to—
BY MR. ALLGOOD: If your Honor please, I’m going to object to the continual hearsay.
BY THE COURT: Sustained.
BY MS. CLINKSCALES: (Continuing)
Q. Floyd, did you ever go to trial on any of the domestic violence charges that were filed against you?
A. No, I didn’t.
Q. Did any of the accusers ever appear with you and a judge on any of the charges of domestic violence?
A. No, they didn’t.
¶ 29. A careful reading of the record reveals that Robinson did not simply and carelessly offer evidence of prior bad acts attributed to him. Instead, Robinson attempted to blunt the prejudicial impact of the prosecution’s improper prior-bad-acts evidence by offering an explanation for those events. It is Robinson’s efforts at blunting the prejudicial effect of the improper prior-bad-acts testimony that the majority now claims turns the admission of that improper evidence into harmless error. Such a claim can only be the result of syllogistically faulty circular reasoning.
¶ 30. The prosecution’s prior-bad-acts evidence was admitted prior to any testimony from Robinson. The damage from this improper prior-bad-acts evidence was completed prior to any testimony from Robinson. The testimony by Robinson as to prior bad acts was presented in an effort to place into perspective the improper prior-bad-acts evidence that was previously introduced by the prosecution. Because the damage was done before Robinson’s attempt at mitigation, I would reverse and remand for a new trial.
¶ 31. In an apparent effort to camouflage its syllogistically faulty circular reasoning, the majority seeks to place the responsibility for the admission of the improper prior-bad-acts evidence upon Robinson by saying that: “Robinson’s defense was based on the premise that the homicide was excusable due to accident and misfortune as set forth in Mississippi Code Annotated section 97-3-17 (Rev.2006).” “It is apparent Robinson interjected his status as a prior convicted domestic violence offender on probation — -logically prohibited from possession of a weapon or from being present at Bridgette’s home-as a strategic trial decision to attempt to explain his otherwise unexplainable flight.”
¶ 32. The fallacy in the majority’s attempt at blaming Robinson is simple and straight forward. Robinson did not present any defense until after the State had rested its case in chief. The improper prior-bad-acts evidence was introduced by the State in its case-in-chief. The State’s sole purpose in introducing this improper prior-bad-acts evidence was to prove that Robinson killed Bridgette. Before Robinson uttered the first word in his defense, the State had introduced the improper pri- or-bad-acts evidence, and the damage had been done. Contrary to the opinion of the majority, once the damage has been done, it cannot be undone. It especially cannot be undone by attempting to blame Robinson for the improper actions of the prosecutor.
¶ 33. For the foregoing reasons, I believe the appropriate action is to reverse and remand this matter for a new trial.
IRVING, BARNES AND ISHEE, JJ., JOIN THIS OPINION.